IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **SOMERSET INDUSTRIES, INC., et al** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **LEXINGTON INSURANCE COMPANY** | : | **NO. 07-1656** |

**Goldberg, J.**                                                                                                          **July 7, 2009**

## MEMORANDUM OPINION

This case involves an insurance coverage dispute between plaintiffs, Somerset Industries, Inc. and Springhouse Partners, Inc. (hereinafter, collectively referred to as "Somerset") and Lexington Insurance Company (hereinafter, referred to as "Lexington"). The claims at issue stem from a rainstorm which Somerset has alleged caused severe water damage to their warehouse and inventory contained therein.

Before the Court is Lexington's Motion for Summary Judgment seeking the dismissal of both the breach of contract and bad faith causes of action. For the reasons stated below, Lexington's Motion is denied as to the breach of contract claim, but granted regarding the bad faith claim.

## I. Facts

Somerset owns and operates a food distribution facility that housed dry, frozen, and refrigerated food products. On July 18, 2006, following a major rainstorm, Somerset's warehouse and the goods stored inside the facility suffered water damage. The storm also caused a temporary power outage which resulted in damage to frozen goods. (Statements of Undisputed Facts, ¶¶ 3, 4, and 31). According to the Complaint, Somerset "sustained serious direct, consequential and ongoing

1

losses and financial damages, including but not limited to electrical equipment, compressors, generators, building and property damage, dry and frozen inventory, various business equipment, costs and expenses for removal of damaged property, repairs and construction and an ongoing interruption of business . . ."  (Complaint, ¶ 9).

Somerset subsequently requested coverage from Lexington for damage to the exterior and interior of the warehouse, dry goods, and refrigerated goods stored in the warehouse.[1]  Somerset also filed a claim for loss of business income.  (Argument 4/15/09, Summ. J. Mot., pp. 4-8).

The original insurance policy issued by Lexington was an all-risk policy, which excluded the following:

> B. EXCLUSIONS
>
>> 1. We will not pay for loss or damage caused directly or indirectly by any of the following.  Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.
>> . . .
>> g. Water
>>    1) Flood, surface water, waves, tides, tidal waves, overflow of any body of water, or their spray, all whether driven by wind or not;
>>    . . .
>>    3) Water that backs up from a sewer or drain; or

However, Somerset paid an additional premium so that the flood and surface water exclusion referenced above was amended to remove the exclusion for flood and surface water, but maintain

---

[1] Somerset also initially made a claim for frozen goods and equipment, however at oral argument, they conceded that no coverage applied due to the Power Failure Exclusion and the "Amendatory Endorsement," which excludes equipment breakdown perils.  (N.T. 4/15/09, p. 6; Policy, Fergusson Affidavit, Exhibit A).

2

the exclusion for "water that backs up from a sewer or drain." The amendment, and thus the final, controlling exclusion language, states:

> FLOOD ENDORSEMENT
>
> 1. In consideration of an additional premium of [] it is understood and agreed that Paragraph B. EXCLUSIONS, Item g. Water . . . is amended as follows:
>
>    g. Water
>       1) Water that backs up from a sewer or drain; or . . .

Thus, the effect of this amendment was to remove the exclusion for damage caused by "flood, surface water, . . . overflow of any body of water," and maintain the exclusion for damage caused by "water that backs up from a sewer or drain." (Policy, Fergusson Affidavit, Exhibit A).

Other pertinent sections of the policy included a limitation for coverage regarding damage caused by rain:

> C. LIMITATIONS
>
> 1. We will not pay for loss of or damage to:
>    . . .
>    c. The interior of any building or structure caused by or resulting from rain, snow, sleet, ice, sand, or dust, whether driven by wind or not, unless:
>
>       1) The building or structure first sustains damage by a Covered Cause of Loss to its roof or walls through which the rain, snow, sleet, ice, sand, or dust enters; or
>
>       2) The loss or damage is caused by or results from thawing of snow, sleet or ice on the building or structure.

(Policy, Fergusson Affidavit, Exhibit A).

Finally, regarding business income loss at issue, the Policy states:

A.    COVERAGE

> We will pay for the actual loss of Business Income you sustain due to the necessary suspension of your "operations" during the "period of restoration." The suspension must be caused by direct physical loss of or damage to property . . . caused by or resulting from any Covered Cause of Loss.

On July 24, 2006, Lexington retained an accounting firm to assist in the verification of the various claimed damages. After performing a preliminary investigation of the premises, Lexington issued a reservation of rights letter on August 7, 2006. From the time the accounting firm was retained until the suit was filed, Lexington continued its investigation of the claim, repeatedly requesting from Somerset additional information regarding the claimed damage.[2] On January 16, 2007, Lexington denied Somerset's requests for an advance payment.[3] (Statements of Undisputed Facts, ¶¶ 37, 53; Somerset's Statement of Undisputed Facts, ¶¶ 73-95).

Somerset filed suit on April 25, 2007, raising three causes of action: (1) Bad Faith (Count I); (2) Breach of Contract (Count II); and (3) Violation of the Unfair Trade Practices and Consumer Protection Law (Count III), which was subsequently dismissed by stipulation. On February 27, 2009, Lexington filed their Motion for Summary Judgment before the Court.[4]

---

[2] Lexington made requests for information on July 31, 2006 (which was responded to on October 19, 2006 and October 31, 2006), November 9, 2006 (which was responded to on November 15, 2006), November 29, 2006, December 15, 2006, December 20, 2006, December 23, 2006, January 4, 2007, January 8, 2007, January 25, 2007, April 6, 2007, and August 2, 2007. (Lexington's Statement of Undisputed Facts, ¶¶ 54-100).

[3] Somerset had requested an advance payment on October 19, 2006, November 13, 2006, and December 1, 2006. (Somerset's Statement of Undisputed Facts, ¶¶ 73-95).

[4] Upon agreement of the parties, and for purposes of trial, the bad faith claims (including Lexington's reverse bad faith claim), were severed from Somerset's breach of contract claim.

4

## II. Applicable Precedent

    A.  Summary Judgment Standard

Summary judgment may be entered where there are no genuine issues as to any material fact and one party is entitled to judgment as a matter of law.  White v. Westinghouse Elec. Co., 862 F.2d 56, 59 (3d Cir. 1988).  The evidence presented must be viewed in the light most favorable to the non-moving party.  Id.  The inquiry is whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one sided that one party must, as a matter of law, prevail over the other.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251 (1986).  The Court's function in deciding a Motion for Summary Judgment is not to decide disputed questions of fact, but only to determine whether genuine issues of fact exist.  Id. at 248-249.

A party seeking summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Where the non-moving party bears the burden of proof on a particular issue at trial, the movant's initial Celotex burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the non-moving party's case." Id. at 325.  After the moving party has met its initial burden, summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Id. at 322.

    B.  Interpretation of An Insurance Contract

The task of interpreting an insurance contract is generally performed by the court.  Standard Venetian Blind Co. v. American Empire Ins. Co., 469 A.2d 563, 566 (Pa. 1983).  When interpreting

an insurance contract, the goal is to ascertain the intent of the parties as manifested by the language of the written instrument. Id. "An insurance policy must be read as a whole and construed according to the plain meaning of its terms." C.H. Heist Caribe Corp. v. American Home Assurance Co., 640 F.2d 479, 481 (3d Cir. 1981).

Where a provision of a policy is ambiguous, the policy provision is to be construed in favor of the insured and against the insurer. Standard Venetian, 469 A.2d at 566. An insurance policy provision is ambiguous if it is "reasonably susceptible of different constructions and capable of being understood in more than one sense." The Medical Protective Company v. Watkins, 198 F.3d 100, 103 (3d Cir. 1999).

### III. Analysis

The parties generally agree that water from the storm entered the building by breaching a loading dock door. They also agree that some damage was caused by rain water which entered through either the roof or flashing. (Statements of Undisputed Facts, ¶¶ 32-33, 43-44). At the center of this dispute is an exterior drain located adjacent to the loading dock door that had at least been partially covered during the storm by a metal plate. Relying on the exclusion for damage caused by "water that backs up from a sewer or drain," Lexington claims that they are excused from covering any damage caused to the property because it is undisputed that at least some of the damage that occurred was caused by the overflow of water from this drain. Lexington explains that because this type of loss is specifically excluded, even if other damage was caused by a covered loss (i.e., surface water), no coverage applies under the "Exclusions" section concurrent loss language which precludes coverage for a loss caused directly or indirectly by any excluded peril, regardless of any other covered cause of loss.

In support of its position, Lexington relies heavily upon the deposition testimony of Jay Shrager, the owner of Somerset, who testified about the metal plate that was placed over the drain in question. Pertinent portions of Shrager's deposition are set forth below:

> Q. Most of these pictures are roof pictures. That's why my question was directed to roofing issues.
> A. . . . these pictures show the immense, powerful storm. This asphalt was ripped up. Bodies of water were forced underneath these – metal plate. The metal plate is – on there was covering this drain to the right completely during the storm. We move equipment in and out through this door to the right of this yellow pole, and <u>that drain was completely blocked during the storm</u>. <u>This water had nowhere to go</u>, but the force of the wind and – pulled all these railroad ties, which were in place as parking stops so that a car would not – you know, our employees would not drive over the wall embankment -- (emphasis added).
> . . .
> Q. What were you commenting about the drain? I'm sorry.
> A. May I point this to you, sir?
> Q. Sure.
> A. And I believe it was Mr. Cipollo who we had conversation about this, I believe. <u>This plate was covering this drain</u>, not knowing a storm was coming or a magnitude. This plate does not normally cover this drain. And this is a wide drain that drains all the water from this area of the parking lot. And it covered that, and the equipment we bring – the reason it's covered is equipment – the moving equipment comes out to get watered – battery watered, serviced – in this little area from time to time (emphasis added).
> . . .
> Q. And you indicated that that metal platform was above the drainage?
> A. Yes.
> Q. And do you think that could have caused the flooding? That could have contributed to the flooding?
> A. Absolutely.
> Q. And do you know whether or not that platform was there on July 17th, was covering the drainage?
> A. Yes, it was.
> . . .
> Q. Because having that platform over the top could affect stormwater management?
> A. Yes. It is my belief that the water rushed into this white building, which is a charger room, and rushed in through – and pushed this door open that is an overhead door behind here that does not show in the photograph that is ground level.

> Q. And again why would someone have put that platform over top of the narrowed – or drainage?
> A. Because the tires of the forklift trucks cannot drive out that far into the parking lot. They get stuck in this grate. It's a grated drain.

(Shrager Depo., 5/22/08, pp. 104-107, Hall Affidavit, Exhibit D). From this deposition testimony, Lexington concludes that Shrager acknowledged that the damage to the property was "absolutely caused or contributed to by water that backed up from a drain outside the building." (Lexington Memo of Law, pp. 5-6).

Lexington also asserts that the report of Somerset's expert, John J. Hare, provides sufficient undisputed evidence that damage was caused by "water that backs up from a sewer or drain." Somerset quotes the following passage from Hare's report in support of this argument:

> It is obvious, from the description by Mr. Shrager, who stated that water was actually flowing out of the storm water drain onto the parking area. The storm drainage system was overwhelmed from hydraulic pressure developing in the system from the surrounding developments that are at higher elevations tha[n] these drains.
>
> My initial impression was that the storm sewers were designed in the 50s. Further, development of the surrounding area over the years added to the flow without any attempts to control it. It is only recently that developers have been required to provide flow calculation and retention/detention basins. Considering these conditions and the description of events by Mr. Shrager, it is my opinion that this is the likely cause of the flood along with some minor contribution from roof leaking at flashings and siding joints. Visual observations at various locations show extensive erosion and give evidence of the severe inundation. Mr. Shrager pointed out several locations where the concrete paving and retaining walls collapsed due to erosion of soils and hydrostatic pressure. Not only was water flowing down the high embankment behind the building which flowed into the building at that location, the water also flowed along each side of the building and into the overhead door near the employees locker room. . . .

(Hare Report, Hall Affidavit, Exhibit I).

At oral argument, and in opposition to the motion, Somerset's counsel stressed that the exclusion language at issue is ambiguous because the word "from," contained within the exclusion

8

"could mean a directional motion of the water, or it could mean water which originates in the drain and is actually coming up out of the drain as opposed to water which is prevented from going into the drain and allowing the drain to perform its function." (Argument 4/15/09, Summ. J. Mot., p. 38.)

Somerset also contends that an issue of fact remains as to whether any "water that backs up from a sewer or drain," caused damage to the warehouse. Somerset points to the same report by Hare, which they assert essentially concludes that the loss was due to flooding and the flow of surface water, both covered losses. Portions of the report relied upon by Somerset state:

> . . . after discussions with Mr. Jay Shrager, President of Somerset Industries, Inc., and his description of events, it is my opinion that the flow of water from the surrounding topography was the major cause of the damage on July 18, 2006. Considering that all of the surrounding area drains directly toward this property and [sic] storm sewer system was obviously overwhelmed.
> . . .
> The building suffered from flooding due to an unusual extreme summer thunderstorm inundating the area, overwhelming the storm drainage system causing water to flow into and through the building on three sides exiting at the end of the building to the lower parking lot.

(Hare Report, Hall Affidavit, Exhibit I).

After considering the respective arguments of the parties and viewing the evidence of record in the light most favorable to Somerset , we are unconvinced that summary judgment on the breach of contract claim is appropriate. We reach this conclusion in part, because it is not clear that the exclusion at issue is susceptible to only one interpretation, and thus, must be construed in favor of Somerset. Moreover, even if we were to adopt Lexington's interpretation of the exclusion at issue, the facts relied upon by Lexington do not conclusively establish that the occurrence falls within the exclusion.

    A. <u>Interpretation of Exclusion - "Water that backs up from a sewer or drain."</u>

Lexington takes the position that if the drain in question was in any way involved in the

flooding that damaged the warehouse, the policy's concurrent loss clause unambiguously directs that all damages are excluded. (Argument 4/15/09, Summ. J. Mot., pp. 17-19, 41). However, Lexington has not cited to any precedent which directly interprets the exclusion at issue. Lexington primarily relies upon Doylestown v. Elec. Supply Co. v. Maryland Cas. Ins. Co., 1996 WL 34393843 (E.D. Pa. Dec. 31, 1996) and Front Row Theatre, Inc. v. American Mfr.'s Mut. Ins. Cos., 18 F.3d 1343 (6th Cir. 1994), which they claim justifies the granting of summary judgment. However, the controlling insurance policies and surrounding facts in each of these cases were notably different from the case sub judice. Indeed, in both Doylestown and Front Row, the insurance policy provided coverage for "water that backs up from a sewer or drain" and excluded surface water. Here, opposite provisions apply as "water that backs up from a sewer or drain" is excluded while surface water is a covered loss.

In Doylestown, a sewer pipe into which a drain emptied became partially blocked by "car parts, debris and possibly vegetation" during a rainstorm. At some point during the storm, the drain became full, and water flowed over the top of the drain and into the insured property. Id. at *1. The parties agreed that the building may have been damaged by a combination of water that entered the sewer system and then backed up, and water that never entered the drain in the first place. Id. at *2. Consistent with the parties' agreement on these facts, the Court found that the damage was caused by both "water that backs up from a sewer or drain" and surface water, and applied the concurrent causation clause precluding coverage for an excluded cause of loss "regardless of any other cause or event that contributes concurrently or in any sequence to the loss." Id. at *4-*5. Importantly, in making this determination, the Court focused primarily on the concurrent causation clause, and did not interpret the sewer backup exclusion language at issue here. Thus, Doylestown's applicability to the facts and exclusion before us is minimal, at best. Moreover, unlike the case sub judice, the

parties in Doylestown agreed that there had been some type of blockage within the drainage system.

In Front Row, both parties agreed that at the time of the rainstorm, the storm sewer surrounding the property suffered a 50% blockage causing it to overflow. The parties also agree that the ensuing damage was caused by this overflow and from water that never entered the storm sewer system. Id. at 1345. The Court found that because there was no dispute that the storm sewer system was 50% blocked, the occurrence clearly fell within the definition of "backs up" and that a portion of the loss was caused by water "which backed up from a sewer." Thus, although this type of loss was covered, because a portion of the damage was also caused by surface water flooding, an excluded loss, the concurrent loss provision of the applicable policy barred coverage. Id. at 1348-1349.

The Front Row case also has minimal applicability to the case before us as the facts and exclusion at issue are different. Here, there are no undisputed facts of record establishing that the drainage system at issue was blocked. Indeed, the only undisputed fact regarding the drain appears to be that a metal plate covering the drain caused surface water to pass over the drain. (Statements of Undisputed Facts, ¶ 32). Moreover, the Court's analysis in Front Row regarding the exclusion at issue was undertaken in the context of that provision being a covered loss, while here, it is excluded. Id. at 1348. In summary, the cases cited by Lexington involved a stipulated set of facts wherein water reversed direction and flowed out of a drain due to a clog, blockage or obstruction within the sewer system. These undisputed facts are simply not of record in the case before this Court.

A careful examination of the policy language before the Court, leads us to conclude that there remains a gray area as to the meaning of "water that backs up from a sewer or drain." This language could be interpreted to apply to scenarios similar to Doylestown and Front Row, where a blockage in the drainage system causes a backup producing an upward flow of water. The exclusion at issue

could also apply to a situation where surface water enters a drain, but due to excessive volume, overflows causing a flood. In either case, where there is more than one possible interpretation, the exclusion at issue must be read to favor coverage. See The Medical Protective Company v. Watkins, 198 F.3d at 103.

This conclusion is further supported by the fact that Somerset paid an additional premium to convert damage caused by a flood and/or surface water from an excluded, to a covered cause of loss. Reading the policy "as a whole," and considering that surface and flood water were covered losses, the policy reflects that coverage would be provided for the situation that occurred here. Indeed, although damage resulting from flood and surface water was covered, interpreting the provision as suggested by Lexington would likely exclude any damage from a flood that also involved a drain, even a perfectly functioning drain.

B. Genuine Issues of Fact Remain Regarding the Occurrence of Loss

We also disagree with Lexington that sufficient undisputed facts exist to establish that damage was caused by "water that backs up from a sewer or drain." While the deposition testimony of Shrager may establish that the drain was covered by a metal plate, and that in Shrager's opinion this could have contributed to the flooding, this testimony does not, as a matter of law, conclusively negate a factual issue as to whether any damage was caused by "water that backs up from a sewer or drain." Indeed, a fair reading of Shrager's deposition reflects that surface water passed over the drain so that any type of "backup" never occurred. See Front Row, 18 F.3d at 1347-1348 (defining surface water was as water that is "commonly understood to be waters on the surface of the ground, usually created by rain or snow . . . " and finding that surface water which never enters the sewer system, retains its character as surface water). As previously noted, unlike in Doylestown and Front Row,

there is no evidence of record establishing that there was a blockage within the drain, whether the water backed up from an internal blockage or from an inundation of surface water, or which direction the flow of water originally followed. There is also no evidence of record establishing that anyone observed that any water surrounding the drain actually contributed to the loss. Shrager's acknowledgment that a metal plate may have been covering the drain and his supposition that this "could have" caused the flooding is simply too tenuous to deprive Somerset from having a fact finder sort through the facts.

Lexington's reliance upon portions of Hare's report also does not justify the granting of summary judgment. Portions of this report could be read to indicate that the loss was caused by "flooding due to an unusual extreme thunderstorm inundating the area," which would be a covered loss. To the extent that Hare does comment upon the drain or sewage system, he does so primarily in reliance upon Shrager's speculation, who, as set forth above, did not observe the occurrence. Consequently, we conclude that there are genuine issues of fact regarding the occurrence that caused the loss.

    C. <u>Damage Caused by Rain</u>

Lexington next argues that the Policy does not cover any rain damage to the interior of Somerset's warehouse. The Limitations section 1.c., precludes coverage for rain damage to a building's interior unless the rain was able to enter through the roof or walls that had been damaged by a covered cause. Lexington claims that there is no evidence that a covered loss caused damage to the roof or walls, and therefore, the rain damage to the warehouse is not covered.

We first note that this Limitation does not affect Somerset's recovery for surface water damage to the warehouse, and thus, a fact finder will need to determine which damage was caused

by rain versus surface water.

Regarding any warehouse damage caused by rain, we find that there still exists a genuine issue of material fact as to whether there was any damage to the roof created by a covered cause of loss. Specifically, Somerset cites to the deposition of Alan Breslow, Somerset's Vice President, who stated that there was a hole in the roof over the tool room, which may be a covered loss.[5] Lexington relies upon the report of John J. Hare, which states that:

> . . . there is no visual evidence of damage to the roof membrane, however there is one location at the juncture of the high and low roofs . . . where water was flowing in the building in torrents. This happened because the roof of the upper level drains down onto the lower roof and in such a sever [sic] storm because of the low slope, the water could not flow quickly enough away from the area and it overtopped the flashings.

(Breslow Deposition, Wheeler Affidavit, Exhibit I, p. 61-63; Hare Report, Hall Affidavit, Exhibit I). Because an issue of fact still exists regarding whether the roof had sustained damage from a covered cause of loss, Lexington's Motion should be denied as to rain damage to the warehouse's interior.

D. Business Income Loss

Lastly, regarding the breach of contract count, Lexington argues that the claim for loss of business income is also not covered. To this end, Lexington contends that there was not a "necessary suspension" of operations, as required by the Policy, and that even if there was a "necessary suspension," it was not as a result of a covered cause of loss. Lexington also asserts that Somerset's claim for business income loss was excessively high.[6]

A "necessary suspension" of operations has been defined as a total cessation of business. See

---

[5] As set forth supra, the Policy at issue is an all-risk policy, and we have found no exclusions pertaining to this type of damage.

[6] During oral argument, Lexington largely focused its attention on the amount of business income loss in the expert report of Neve, Olszewski & Company, P.C., claiming that the expert's estimated damage was unreasonable. (N.T. 4/15/09, pp. 28-33). This claim is not appropriately decided by Motion.

TJS Brokerage & Co. v. Hartford Cas. Ins. Co., 2002 WL 826484, *6 (Pa. Com. Pl. 2002). According to Lexington, Somerset has not presented any evidence of a total cessation of business operations. Somerset responds that their operations were in fact shut down temporarily from July 18, 2006 to July 21, 2006, due to a loss of power, the loss of inventory and the flooding. Shrager stated in his deposition that when he went to the warehouse after the storm, the parking area was torn up, the center section of the building was completely flooded, and the electricity and phones were down. Shrager also stated that he immediately worked to get the warehouse back up and running. (Wheeler Affidavit, Exhibit B, pp. 125-140, 176; Argument 4/15/09, Summ. J. Mot., p. 45). Somerset also supports its claim with the expert report of Neve, Olszewski & Company, P.C., which attributes significant business income loss to the storm. (Report of Neve, Olszewski & Company, P.C., Wheeler Affidavit, Exhibit H). Because Somerset has presented evidence that the storm created a "necessary suspension" that caused a loss of business income, this claim will be submitted to a fact finder.

**IV. Bad Faith**

Lexington next moves to dismiss Somerset's claim of bad faith brought pursuant to 42 Pa. C.S. § 8371. This section provides:

> In an action arising under an insurance policy, if the court finds that the insurer has acted in bad faith toward the insured, the court may take all of the following actions:
>
> (1) Award interest on the amount of the claim from the date the claim was made by the insured in an amount equal to the prime rate of interest plus 3%.
> (2) Award punitive damages against the insurer.
> (3) Assess court costs and attorney fees against the insurer.

42 Pa. C.S. § 8371.

In order to prevail on a claim for bad faith, a plaintiff must show by clear and convincing

evidence that the insurer: (1) did not have a reasonable basis for denying benefits under the policy; and (2) knew or recklessly disregarded its lack of reasonable basis in denying the claim. UPMC Health Sys. v. Metro. Life Ins. Co., 391 F.3d 497, 505 (3d Cir. 2004); Terletsky v. Prudential Property & Cas. Ins. Co., 649 A.2d 680, 688 (Pa. Super. Ct. 1994). Bad faith has been defined as:

> . . . any frivolous or unfounded refusal to pay proceeds of policy; it is not necessary that such refusal be fraudulent. For purposes of an action against an insurer for failure to pay a claim, such conduct imports a dishonest purpose and means a breach of a known duty (i.e., good faith and fair dealing), through some motive of self-interest or ill will; mere negligence or bad judgment is not bad faith.

Adamski v. Allstate Ins. Co., 738 A.2d 1033, 1036 (Pa. Super. Ct. 1999); Brown v. Progressive Ins. Co., 860 A.2d 493, 501 (Pa. Super. Ct. 2004).

Bad faith encompasses a wide variety of objectionable conduct by an insurer, and bad faith may also extend to the insurer's investigative practices. O'Donnell v. Allstate Ins. Co., 734 A.2d 901, 906 (Pa. Super. 1999). It is not bad faith for an insurer to take a stand with a reasonable basis or to aggressively investigate and protect its interests. Id. at 910 (citing Jung v. Nationwide Fire Ins. Co., 949 F.Supp. 353, 360 (E.D. Pa. 1997)). However, a delay in making payment on a claim is a relevant factor in determining whether bad faith has occurred. Cher-D, Inc. v. Great American Alliance Ins. Co., 2009 WL 943530, (Apr. 7, 2009).

"In order to survive a dispositive motion as to bad faith, a plaintiff must meet the substantial burden of showing by clear and convincing evidence that said elements are met." Easy Sportswear, Inc. v. American Economy Ins. Co., 2007 WL 4190767, *12 (W.D. Pa. Nov. 21, 2007).

In their Complaint, Somerset alleged that Lexington acted in bad faith by failing to promptly investigate and offer payment on the claim. (See generally, Complaint). In its Motion, Lexington argues that Somerset has not met its burden of proof by providing clear and convincing evidence that

16

they acted in bad faith and that Somerset's failure to cooperate contributed to delay the process. Lexington primarily bases their argument on the fact that it has made numerous requests to Somerset for information in support of the claimed loss and that Somerset has failed to provide all of the requested documents. In response, Somerset argues that Lexington ignored their repeated inquiries regarding the status of their claim and their requested advance. Somerset also claims that Lexington's actions were in violation of the Unfair Insurances Practices Act ("UIPA").[7]

We find that Somerset has failed to present evidence that Lexington acted with a dishonest purpose or that Lexington did not have a reasonable basis for its actions. The undisputed facts of record reflect that the accounting firm retained by Lexington first requested information from Somerset on July 31, 2006.[8] Somerset responded to this initial inquiry on October 19, 2006 and October 31, 2006. Lexington requested additional information on November 9, 2006, to which Somerset replied on November 15, 2006.[9] On November 29, 2006, Lexington submitted to Somerset, a follow-up request for information.[10] The record before us reflects that Somerset never responded

---

[7] Conduct which violates the UIPA may be considered when determining whether an insurer acted in bad faith. O'Donnell, 734 A.2d at 906. The UIPA generally prohibits an insurer inter alia from refusing to pay a claim without a reasonable basis, failing to affirm or deny a claim in a reasonable period of time, not attempting good faith settlements when liability is clear, and compelling litigation by offering substantially less than the amount due. 40 P.S. § 1171.5(a)(10). The UIPA violations simply repeat the allegations in the Complaint that Lexington acted in bad faith by delaying its investigation and failing to settle. As such, we will not separately address the UIPA, but we will consider any delay and Lexington's failure to settle, in determining this Motion.

[8] Lexington's accounting firm requested the following information on July 31, 2006: (1) Listing of Inventory Claim; (2) Disposal of Damaged Product [to confirm that damaged stock was disposed rather than sold or salvaged]; (3) Original & Replacement Purchase Invoices; and (4) Perpetual Inventory Records [which lists the inventory before and after the storm]. (Lexington's Statement of Undisputed Facts, ¶¶ 55-59).

[9] The parties disagree as to whether Somerset had fully complied with Lexington's requests up to this point. However, the record reflects that even after its November 15, 2006 response, Somerset had not submitted to Lexington documentation regarding damage to the building, equipment, fixtures or the business income loss. (Statements of Undisputed Facts, ¶¶ 70-71; Flaherty Affidavit, Exhibits B and G).

[10] The follow-up request of November 29, 2006 sought: (1) Disposal of Damaged Product; (2) Original & Replacement Purchase Invoices; (3) Perpetual Inventory Records; and (4) Income Statements. (Lexington's Statement of Undisputed Facts, ¶ 74). We note that items (1), (2) and (3) had been previously requested by

17

to this request although Lexington renewed the request and made additions to it on December 15, 2006, December 20, 2006, December 23, 2006, January 4, 2007, January 8, 2007, January 25, 2007, and April 6, 2007.[11]

Given the extent of the alleged loss, which required a thorough investigation by Lexington, and Somerset's delayed response to the requests for information, this Court finds that Somerset has not provided clear and convincing evidence that Lexington did not have a reasonable basis for its handling of the investigation.[12]

## V. Conclusion

For the foregoing reasons, Lexington's Motion for Summary Judgment shall be granted in part, in that Count I - Bad Faith shall be dismissed. Lexington's motion regarding Count II - Breach of Contract is denied. Our Order follows.

---

Lexington.

[11] Regarding these subsequent requests, Somerset claims that "[a]dditional requests for information have been made by Lexington which have been fully satisfied by Somerset" and "Somerset has fully complied with Lexington's request and has submitted documentation in support of its claimed losses for frozen stock, dry stock and extra expenses." (Somerset's Statement of Undisputed Facts, ¶¶ 97-117). However in support of these statements, Somerset cited its initial response of October 19, 2006, and the fact that Lexington's accountants were given access to Somerset's facility in July 2008. (Wheeler Affidavit, ¶¶ 14-15). Therefore, there is no clear indication from the record that Somerset has responded to Lexington's subsequent requests for information.

[12] As stated above, Somerset also claims that Lexington acted in bad faith by ignoring multiple requests for an advance payment. However, considering Lexington's delayed and unanswered requests for information, Lexington's delay in denying the advance payment was not without a reasonable basis.